# EXHIBIT 9

# JONES DAY

3161 MICHELSON DRIVE • SUITE 800 • IRVINE, CALIFORNIA 92612.4408

TELEPHONE: +1.949.851.3939 • JONESDAY.COM

DIRECT NUMBER: +1.949.553.7513
CARYSULLIVAN@JONESDAY.COM

September 17, 2024

**SETTLEMENT PRIVILEGED COMMUNICATION**

***Via Email***

Wendy Heilbut, Esq.
HEILBUT LLP
276 Fifth Ave., Suite 704
PMB 17
New York, NY 10001
wendy@heilbutllp.com

Re:    *Final Attempt to Avoid Litigation*

Dear Ms. Heilbut:

On behalf of ESHA Research, LLC, now known as Trustwell ("Trustwell"), we have enclosed a draft complaint that we intend to file if Foodwit does not comply with our demands. Per your request, we have also enclosed another copy of the terms of services and end user license agreement. Please consider this Trustwell's final attempt to avoid litigation.

We previously communicated our demands to you by letter dated August 6, 2024. Unfortunately, you dismissed our letter as nothing more than a "bullying tactic." We can assure you that our efforts to resolve this matter informally are not a bullying tactic but rather an effort to save our respective clients the burden and expense of litigation. However, Foodwit's compliance with our demands is necessary to avoid litigation. To date, Foodwit has not complied.

As reflected in the draft complaint, we believe Foodwit's breaches of the license agreement and other violations of federal and state law are egregious. Trustwell has been and continues to be damaged in very significant ways by Foodwit's misconduct. While our preference is to resolve this matter informally, our demands are firm.

Given that Foodwit's license agreement has now expired, please confirm in writing that Foodwit did not retain, no longer has, and will not use *any* Trustwell information or material for any reason, including but not limited to confidential, proprietary, and trade secret information like software, software code, database structures and content, report formats, interface designs, business plans, marketing plans, information about publication plans, software features under development, and algorithms.

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
MELBOURNE • MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Wendy Heilbut, Esq.
September 17, 2024
Page 2

In addition, as previously requested, please provide a complete accounting of all marketing and sales conducted by Foodwit utilizing or relying on Trustwell's software, nutritional data, and related information, including its database.

Finally, pursuant to section 13 of the license agreement, we hereby demand that Foodwit immediately surrender to Trustwell all notes, records, documentation, models, software, databases, and other items or materials referencing, containing, or based on Trustwell's confidential, proprietary, and trade secret information, including, by way of example only and without limitation, software, software code, database structures and content, report formats, interface designs, business plans, marketing plans, information about publication plans, software features under development, and algorithms.

Please confirm in writing by **Monday, September 23, 2024**, that Foodwit will comply with each of these demands. If we do not receive written confirmation by September 23, we will understand that Foodwit does not intend to comply, and we will proceed accordingly.

We write with all rights reserved.

Very truly yours,

Cary D. Sullivan

Enclosure: draft complaint; EULA
NAI-1541208660v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESHA RESEARCH, LLC, now known as TRUSTWELL, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. |
| RLH ASSETS, LLC dba FOODWIT; and DOES 1-20, | ) ) ) | |
| Defendants. | ) ) ) | |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

**JURY TRIAL DEMANDED**

1.      Plaintiff ESHA Research, LLC, now known as Trustwell ("Trustwell"), brings this complaint against Defendant RLH Assets, LLC, doing business as Foodwit ("Foodwit," and collectively with Trustwell, the "Parties"), for injunctive relief and monetary damages as well as such other relief as specified herein, as follows:

## INTRODUCTION

2.      This case is about the calculated theft of Trustwell's crown jewels—the gold-standard software system called Genesis Foods, which, among other things, automates processes for food and supplement formulation, labeling calculations, and regulatory compliance—that Foodwit secretly accessed and used to help build and launch a competing product called Workbench.  Foodwit recently announced the creation and launch of Workbench, which it touts as a "world-class compliance solution" that "features integrated compliance checks and workflows to validate compliance, formulation, claim and labeling data."

3.      Trustwell, a leading SaaS provider to the food and supplements industries, first introduced its Genesis Foods software system to customers in 1991, enabling companies to formulate foods virtually, create government-compliant nutrition panels and labels, and analyze the nutritional content of recipes, among a host of other functions.  Trustwell has continually updated and improved its Genesis Foods system over the years.  In 2024, Trustwell launched the next generation of the system, providing a state-of-the-art, all-in-one platform for nutrition analysis, food and supplement formulation, recipe development, labeling, and regulatory compliance, including U.S., Mexico, Canada, Australia, New Zealand, and European Union food labeling requirements and guidelines.  The new platform features a streamlined user interface offering fast and intuitive product formulation and data entry while assisting users with regulatory compliance through built-in, automated data checks and alerts.  It also automates the process of labeling calculations, making it easy for companies to create new product formulations within minutes and make real-time changes to existing recipes.

4.      Genesis Foods is backed by Trustwell's industry-leading food and ingredient database, which is embedded in the platform and includes, among other things, comprehensive

1

nutritional breakdowns for up to 172 separate data fields, including proximates, vitamins, minerals, amino acids, and other nutrient components, for more than 90,000 brand name and generic foods and ingredients.  The database includes a substantial volume of confidential and proprietary ingredient components and related data and other features that are not publicly available.  This proprietary, confidential, and trade secret software system and related database (collectively, the "Trade Secrets"), developed through decades of investment in research and development, is widely recognized as the gold-standard for food and nutrition research and development and regulatory compliance.

5.      In 2017, Foodwit approached Trustwell to request a license to access and use the Genesis Foods system for its own internal business use.  Trustwell entered into a limited-use license agreement with Foodwit (the "License Agreement"), which the Parties renewed annually. The License Agreement does not authorize Foodwit to commercialize Trustwell's Trade Secrets or otherwise leverage them to help build and launch a competing product.  Nevertheless, on information and belief, Foodwit secretly accessed and used those materials to build and launch Workbench.

6.      Trustwell learned of Foodwit's scheme in mid-2024.  Trustwell promptly sent Foodwit a cease-and-desist letter, demanding, among other things, that Foodwit immediately "[t]erminate all use by Foodwit of Trustwell's nutritional data and related information and software, including its database, to develop, launch, or support any products that compete, directly or indirectly, with Trustwell;" and to "[p]rovide a complete accounting of all marketing and sales conducted by Foodwit utilizing or relying on Trustwell's nutritional data and related information and software, including its database."

7.      Foodwit responded by dismissing the cease-and-desist letter as nothing more than a "bullying tactic" and baldly denying any misconduct.  To date, Foodwit has not complied with Trustwell's demands.  This action follows.

**PARTIES**

8.      ESHA Research, LLC was founded in Oregon in 1981.  After merging with another business in 2022, the company rebranded as Trustwell.  Plaintiff Trustwell is a privately held limited liability company based in, and with its principal place of business located in, Beaverton, Oregon.  Trustwell's parent company is based and registered in Delaware.

9.      On information and belief, Defendant Foodwit is a privately held limited liability company based in, and with its principal place of business located in, Salem, Oregon.

**JURISDICTION AND VENUE**

10.     This Court has original jurisdiction over Trustwell's claims pursuant to 28 U.S.C. §§ 1331 and 1367(a).  Alternatively, this Court has supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy and derive from a common nucleus of operative facts as Trustwell's federal claims.

11.     The Parties expressly consented to this Court's personal jurisdiction over them pursuant to section 23 of the License Agreement, which states as follows:

> The parties agree that any suit, action, or arbitration proceeding arising out of or relating to this [License] Agreement shall be brought in and the parties expressly consent to the exclusive jurisdiction of the courts of the state of Delaware.

Moreover, as set forth below, Foodwit possesses the requisite minimum contacts with Delaware.

12.     Venue is proper in this judicial district pursuant to the Parties' express agreement in section 23 of the License Agreement.  Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b) & (c).

**FACTS**

13.     In 2017, Foodwit, a start-up company at the time, first approached Trustwell to request a license to access and use its Genesis Foods software system.  Based on Foodwit's representation that it would use Genesis Foods solely for its own internal business use, Trustwell entered into the limited-use License Agreement with Foodwit.  The Parties renewed the License

Agreement annually.  The Parties most recently renewed the License Agreement as of August 30, 2023, and it expired by its terms on August 29, 2024.  Foodwit has described itself as a "super user" of Genesis Foods, accessing and using it on a daily basis.

14.    Section 3 (Limitations on License) of the License Agreement provides, in pertinent part, as follows:

> Licensee may use the Licensed Software solely for its internal business use ….  The Licensee is not licensed to do any of the following: (a) copy, sublicense, rent, lease, lend or otherwise transfer, disclose or publish the Licensed Software (or any portions thereof), or in any manner transfer or assign Licensee's rights under this Agreement without the prior written consent of ESHA; (b) use the Licensed Software for any purpose other than the purposes specifically licensed herein; (c) use the Licensed Software for the benefit of third parties or as part of its own commercially licensed products or services; (d) remove or obscure the ESHA copyright or trademark notices, or those of applicable Third Party Vendors, appearing on or with the Licensed Software; (e) compile the Licensed Software from one form to another or attempt to interfere with, disable, modify, convert, reverse engineer, reverse compile, change or reverse assemble it; [and] (f) compile, extract, strip, mine, harvest or otherwise collect, directly or indirectly, the data from the nutritional database embedded within the Licensed Software.

15.    Section 6 (Ownership, Copyrights) of the License Agreement provides, in pertinent part, as follows:

> ESHA is the sole owner of all rights, title, and interest in the ESHA Software, including the embedded nutritional and regulatory database(s) and all customized and derivative works based upon them, and including all copies thereof and all copyright, patent, trademark, trade secret rights and other intellectual property rights embodied therein.

16.    Section 7 (Licensee's Obligations to Protect the Licensed Software) of the License Agreement provides as follows:

> As a continuing condition of the licenses granted herein, Licensee covenants to use the Licensed Software only for the purposes set forth in this Agreement and for no other purpose and shall use

4

commercially reasonable efforts to protect the Licensed Software from unauthorized use, reproduction, publication, or distribution.

17.     Section 13 (Confidential Information) of the License Agreement provides, in pertinent part, as follows:

The Licensed ESHA Software (including the nutritional and regulatory database information embedded therein) and all other information ESHA discloses to Licensee in connection with them, shall be considered ESHA's Confidential Information, which ESHA discloses only subject to this Agreement. Licensee agrees that it and its employees, agents and representatives shall, except as permitted herein: (i) keep ESHA's Confidential Information strictly confidential, and shall not disclose such information to any other person or entity without the express written consent of ESHA; (ii) limit internal disclosure of the Confidential Information solely to its employees, agents and representatives who must be apprised of the Confidential Information to advance the purposes of this Agreement, and only to the extent that they must be apprised for those purposes; (iii) contractually bind all such persons to honor the confidentiality and use restrictions imposed upon the Licensee; (iv) use the Confidential Information solely for the purpose of using the Licensed Software as licensed by ESHA in this Agreement; and (v) upon demand, immediately surrender to ESHA the Confidential Information and all notes, records, documentation, models, software, databases and other items or materials containing such Confidential Information.

18.     Section 18 (Remedies) of the License Agreement provides, in pertinent part, as follows:

The parties agree that in the event of a breach of any of the covenants pertaining to ESHA's intellectual property rights or Confidential Information, such a breach will result in irreparable and continuing damage in an amount which is not readily ascertainable and for which there will be no adequate remedy at law. In the event of any breach of such covenants, ESHA shall be entitled to injunctive relief and such other and further relief, including damages, as may be provided by law.

19.     Section 22 (Governing Law) of the License Agreement provides that it "shall be governed by and construed in accordance with the laws of the state of Delaware without regard to, or application of, any conflict of law provisions."

20.     As mentioned above, Trustwell first introduced its Genesis Foods software system to customers in 1991, enabling companies to formulate foods virtually, create government-compliant nutrition panels and labels, and analyze the nutritional content of recipes, among a host

of related functions. Through decades of investment in research and development, Trustwell has continually updated and improved the system. In 2024, Trustwell launched the next generation of Genesis Foods, providing a state-of-the-art, all-in-one platform for nutrition analysis, food and supplement formulation, recipe development, labeling, and regulatory compliance, including U.S., Mexico, Canada, Australia, New Zealand, and European Union food labeling requirements and guidelines. While concept work for the new platform began several years before, coding work began in earnest in 2021. In 2023, Foodwit received a confidential presentation regarding planned upgrades to the platform, including the new user interface. The new platform features a streamlined user interface offering fast and intuitive product formulation and data entry while assisting users with regulatory compliance through built-in, automated data checks and alerts, and is supported by Trustwell's industry-leading and proprietary food and ingredient database. The platform also automates the process of labeling calculations, making it easy for companies to create new product formulations within minutes and make real-time updates to existing recipes.

21.     Trustwell derives independent economic value from the fact that its Trade Secrets are not generally known or readily ascertainable through proper means. Indeed, Genesis Foods is widely recognized as the gold-standard system for nutrition analysis, food and supplement formulation, recipe development, labeling, and regulatory compliance. By licensing access to and use of its Trade Secrets, including Genesis Foods, subject to strict terms and conditions, Trustwell generates revenue and income through licensing fees. Such licensing represents a substantial portion of Trustwell's business.

22.     Trustwell takes reasonable steps to protect the secrecy of its Trade Secrets. For example, Trustwell provides its customers access to such information solely pursuant to agreements that contain confidentiality provisions and other protections substantially similar to those contained in the License Agreement. Moreover, Trustwell uses electronic, physical, and other security measures to maintain the secrecy of such information maintained in its secure facilities, such as password protections, firewalls, and other technical mechanisms. Trustwell also executes confidentiality agreements with employees, and tracks and limits employee access

to such information, providing it only to the extent necessary to perform their job functions. Trustwell also regularly instructs and repeatedly reminds its employees of the highly sensitive and confidential nature of its Trade Secrets, which must be protected at all times from disclosure to third parties.

23.     Over a period of several months in 2022 and 2023, Foodwit engaged in discussions with Trustwell's Delaware parent company regarding a potential investment in or acquisition of Foodwit by Trustwell's parent company. Over the course of those discussions, Foodwit's founder and owner, Becki Holmes, revealed that Foodwit is a "super user" of Genesis Foods, utilizing it on a daily basis. In fact, Foodwit relied so heavily on Genesis Foods that one of the required qualifications for new hires was listed as "[p]roficiency in [Trustwell] Genesis nutrient analysis software." Ms. Holmes also mentioned that she did not believe there were viable competitors to Genesis Foods in the market because of its unique and powerful regulatory compliance tools. She claimed Foodwit had a greater industry reach than Trustwell, suggesting that if Foodwit replicated the Genesis Foods system, it would become a more commercially successful product because of Foodwit's purportedly greater industry reach. Trustwell's parent company did not invest in or acquire Foodwit.

24.     In 2024, Trustwell launched the next generation of Genesis Foods. Pursuant to the terms, conditions, and protections of the License Agreement, Foodwit accessed and used the new Genesis Foods system. However, on information and belief, Foodwit secretly accessed and used the new Genesis Foods system to help design and build Workbench, and exported a substantial volume of data from Genesis Foods for that purpose. Foodwit recently announced the creation and impending launch of Workbench, which Foodwit describes as a "world-class compliance solution" that "features integrated compliance checks and workflows to validate compliance, formulation, claim and labeling data."

25.     Trustwell has reviewed publicly available information, including screenshots and other information, regarding the features and functionalities of Workbench. On information and

belief, Workbench is based on and derived from Genesis Foods with respect to a large number of features and functionalities, including but not limited to the following:

- Build and scale recipes from ingredients;
- Analyze real-time formula impact to nutrient, ingredient, and allergen profiles;
- Integrated regulatory compliance checks;
- Automated alerts for regulatory compliance issues;
- Automated alerts based on ingredients for things like allergens;
- SaaS-based application;
- Look and feel of the user interface;
- Ingredient statement with manual override;
- Ingredient standard of identity;
- Listing of standard and non-standard nutrients;
- Nutrient fact panel displayed with recipe formulation;
- Reporting and downloadable print production assets (labels); and
- Upload documents per recipes.

This is not surprising given that Foodwit accessed and used Genesis Foods on a daily basis while developing and building Workbench. Indeed, it appears that Foodwit and Ms. Holmes essentially duplicated at least substantial portions of Genesis Foods.

      26.      Foodwit makes the following additional representations, among others, regarding Workbench on its website:

- "Engineered by food and supplement industry veterans;"
- "Go-to-market more quickly with built-in compliance analyses, document management, reporting and downloadable production-ready label assets;"
- "See real-time formula impacts to nutrient, ingredient and allergen profiles;"
- "[B]uilt-in compliance analyses for food regulations;"
- "Trusted by leading brands;"

- "Workbench … is a breakthrough for compliance software in the food and beverage industry, offering unmatched compliance and efficiency;" and

- "[I]t's a revolution in managing compliance, offering real-time nutrient evaluation and allergen compliance with the peace of mind that regulatory experts have validated its methods."

27.    At least substantial portions of the Workbench software system that Foodwit advertises and repeatedly touts on its website as, among other things, a "breakthrough," a "revolution," and "world-class" appear to be, in fact, Trustwell's Trade Secrets, access to which was provided to Foodwit solely pursuant to the limited-use License Agreement.  Foodwit omits that it secretly leveraged Trustwell's Trade Secrets to design and build Workbench.  Foodwit also omits that, by doing so, it avoided decades of investment in research and development and thereby gained access to valuable markets without commensurate investment.  On information and belief, Foodwit knew it could not afford the investment—in time or money—necessary to develop legitimately a software system that could compete with Genesis Foods.  Foodwit therefore resorted to misappropriation to quickly and cheaply create a competitive product.  In so doing, Foodwit also relieved itself of its heavy reliance on Genesis Foods; it no longer had to license Genesis Foods because it essentially duplicated the system.

28.    At no point did Trustwell ever authorize Foodwit to access, use, or disclose its Trade Secrets in any way beyond the terms and conditions of the License Agreement.  Trustwell has never and would never knowingly provide access to its Trade Secrets to enable a company to commercialize or otherwise leverage those materials to help build a competing product and enter valuable markets with virtually no investment.  On information and belief, Foodwit failed even to provide proper attribution, as required by section 6 of the License Agreement.  In other words, through the above representations and omissions, as well as numerous others on its website and elsewhere, Foodwit falsely and deceptively marketed, and continues to falsely and deceptively

market, Trustwell's crown jewel Trade Secrets as Foodwit's own creation, the result of Foodwit's own honest, hard work.

29.     Foodwit has flatly refused Trustwell's efforts to meet and confer about this dispute, dismissing Trustwell's cease-and-desist letter as nothing more than a "bullying tactic." Foodwit has offered nothing to substantiate its assertion that it did nothing wrong in building Workbench, which is not surprising given the substantially identical nature of the two systems. Foodwit said only that it would not renew the License Agreement after it expired by its terms on August 29, 2024.  Of course, Foodwit has no further need for Genesis Foods now that it appears to have copied for its own use at least substantial portions of Trustwell's system.  On information and belief, Foodwit's continuing refusal to substantively engage with Trustwell on this dispute is intentional, meant to minimize publicly available information about Workbench so as not to reveal even more substantial similarities with Genesis Foods, demonstrating the malicious and oppressive nature of Foodwit's continuing misconduct.

30.     When Foodwit refused to agree to stop its ongoing misappropriation, and refused to comply with Trustwell's other demands, Trustwell's only available recourse was to file suit.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

31.     Trustwell hereby incorporates by reference paragraphs 1 through 30, inclusive, as if set forth fully herein.

32.     As set forth above, Trustwell entered into the License Agreement with Foodwit in 2017, renewing it annually through 2024, and provided Foodwit access to and use of Genesis Foods and related information pursuant to the terms, conditions, and protections of the License Agreement.

33.     By using Genesis Foods and related information as described above, Foodwit has breached and continues to breach at least sections 3, 6, 7, and 13 of the License Agreement.

34.     As a direct and proximate result of Foodwit's breaches, Trustwell has suffered and will continue to suffer irreparable injury and substantial damage.  Trustwell is also entitled to an award of attorneys' fees pursuant to section 24 of the License Agreement, which provides, in pertinent part, that "[i]f either party to this Agreement breaches any term of this Agreement, then the other party shall be entitled to recover all expenses of whatever form or nature, costs, and attorneys' fees reasonably incurred to enforce the terms of the Agreement, whether or not suit is filed."

## SECOND CAUSE OF ACTION

## MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836, *et seq.*)

35.     Trustwell hereby incorporates by reference paragraphs 1 through 30, inclusive, as if set forth fully herein.

36.     Trustwell owns and possesses its Trade Secrets.  As set forth above, Trustwell granted Foodwit access to and use of the Trade Secrets pursuant to the terms, conditions, and protections of the License Agreement.

37.     As set forth above, Foodwit secretly accessed and used, and continues to use and disclose, the Trade Secrets in violation of the terms, conditions, and protections of the License Agreement, including to help build, market, and launch Workbench.

38.     As set forth above, Foodwit secretly accessed and used, and continues to use and disclose, the Trade Secrets to market and sell Workbench to the same types of customers who presently utilize Genesis Foods, in a concerted effort to divert such customers and business away from Trustwell and to Foodwit.

39.     As set forth above, Trustwell takes reasonable steps to protect the secrecy of its Trade Secrets.

40.     As set forth above, Trustwell's Trade Secrets, developed through decades of investment in research and development, provide it with a competitive advantage, and Trustwell derives independent economic value from the fact that its Trade Secrets are not generally known

or readily ascertainable through proper means.  Trustwell's Trade Secrets are of great value to Trustwell and would give any competitor an unfair advantage, as they have to Foodwit.

41.    As set forth above, Foodwit willfully misappropriated Trustwell's Trade Secrets, accessing, using, and disclosing them for their own competitive use and for their own financial benefit.

42.    On information and belief, and as set forth above, Foodwit, including through its founder and owner, Ms. Holmes, intentionally, knowingly, and willfully misappropriated Trustwell's Trade Secrets, and such misappropriation has been malicious, fraudulent, and oppressive.

43.    On information and belief, and as set forth above, Foodwit is still in possession of, and continues to use and disclose, Trustwell's Trade Secrets.  If Foodwit's misconduct is not remedied, it will continue to misappropriate Trustwell's Trade Secrets for its own benefit and to Trustwell's substantial detriment.

44.    Because Trustwell's remedy at law is inadequate, Trustwell seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its Trade Secrets and other legitimate business interests.  Moreover, Foodwit's intentional, willful, and malicious conduct indicates that injunctive or other equitable relief will be inadequate to prevent such future misconduct.  Therefore, Trustwell also seeks an order under 18 U.S.C. § 1836(b)(2) for the seizure of any and all of Trustwell's Trade Secrets and confidential or proprietary information in the possession, custody, or control of Foodwit.

45.    As a direct and proximate result of Foodwit's misconduct, Trustwell has suffered and will continue to suffer irreparable injury and substantial damage.  Trustwell is also entitled to an award of lost profits, restitution, exemplary damages, reasonable royalties, and attorneys' fees.

## THIRD CAUSE OF ACTION

## FALSE ADVERTISING AND FALSE DESIGNATION OF ORIGIN UNDER THE

## LANHAM ACT (15 U.S.C. § 1125(a))

46.      Trustwell hereby incorporates by reference paragraphs 1 through 30, inclusive, as if set forth fully herein.

47.      As set forth above, Foodwit misappropriated Trustwell's confidential, proprietary, and trade secret Genesis Foods software system and related information to build, market, and launch its competing product, Workbench, to customers across the country.  In the process, and as set forth above, Foodwit has made and continues to make false and misleading statements, and deceptively failed to disclose material information, about the origin, development, and purportedly unique nature of Workbench, including its features and functionalities, which were built using Trustwell's stolen materials.

48.      On information and belief, and as set forth above, Foodwit's false and misleading representations and omissions had the tendency to confuse and deceive, and did confuse and deceive, consumers across the country (i.e., the intended audience), who would not seek to purchase or license Workbench if they knew the truth, and instead likely would do business (or continue to do business) with Trustwell.

49.      As set forth above, Foodwit's falsely-represented product, Workbench, is marketed and sold across the country and travels in, and has a substantial effect on, interstate commerce.

50.      As a direct and proximate result of Foodwit's misconduct, Trustwell has suffered and will continue to suffer irreparable injury and substantial damage.  Trustwell is also entitled to an award of treble damages and attorneys' fees.

**FOURTH CAUSE OF ACTION**

**MISAPPROPRIATION OF TRADE SECRETS UNDER THE DELAWARE UNIFORM**

**TRADE SECRETS ACT (6 DEL. CODE ANN. § 2001, *et seq*.)**

51.     Trustwell hereby incorporates by reference paragraphs 1 through 30, inclusive, as if set forth fully herein.

52.     As set forth above, Trustwell owns and possesses its Trade Secrets.  Trustwell granted Foodwit access to and use of the Trade Secrets pursuant to the terms, conditions, and protections of the License Agreement.

53.     As set forth above, Foodwit secretly accessed and used, and continues to use and disclose, the Trade Secrets in violation of the terms, conditions, and protections of the License Agreement, including to help build, market, and launch Workbench.

54.     As set forth above, Foodwit secretly accessed and used, and continues to use and disclose, the Trade Secrets to market and sell Workbench to the same types of customers who presently utilize Genesis Foods, in a concerted effort to divert such customers and business away from Trustwell and to Foodwit.

55.     As set forth above, Trustwell takes reasonable steps to protect the secrecy of its Trade Secrets.

56.     As set forth above, Trustwell's Trade Secrets, developed through decades of investment in research and development, provide it with a competitive advantage, and Trustwell derives independent economic value from the fact that its Trade Secrets are not generally known or readily ascertainable through proper means.  Trustwell's Trade Secrets are of great value to Trustwell and would give any competitor an unfair advantage, and they have to Foodwit.

57.     As set forth above, Foodwit willfully misappropriated Trustwell's Trade Secrets, accessing, using, and disclosing them for its own competitive use and for its own financial benefit.

58.     On information and belief, and as set forth above, Foodwit, including through its founder and owner, Ms. Holmes, intentionally, knowingly, and willfully misappropriated

Trustwell's Trade Secrets, and such misappropriation has been malicious, fraudulent, and oppressive.

59.    On information and belief, and as set forth above, Foodwit is still in possession of, and continues to use and disclose, Trustwell's Trade Secrets. If Foodwit's misconduct is not remedied, it will continue to misappropriate Trustwell's Trade Secrets for its own benefit and to Trustwell's substantial detriment.

60.    Because Trustwell's remedy at law is inadequate, Trustwell seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its trade secrets and other legitimate business interests. Moreover, Foodwit's intentional, willful, and malicious conduct indicates that injunctive or other equitable relief will be inadequate to prevent such future misconduct. Therefore, Trustwell also seeks an order under 6 Del. Code Ann. § 2002(c) for the seizure of any and all of Trustwell's Trade Secrets in the possession, custody, or control of Foodwit.

61.    As a direct and proximate result of Foodwit's misconduct, Trustwell has suffered and will continue to suffer irreparable injury and substantial damage. Trustwell is also entitled to an award of lost profits, restitution, exemplary damages, reasonable royalties, and attorneys' fees.

### FIFTH CAUSE OF ACTION

### DECEPTIVE TRADE PRACTICES UNDER THE DELAWARE DECEPTIVE TRADE PRACTICES ACT (6 DEL. CODE ANN. § 2531, *et seq.*)

62.    Trustwell hereby incorporates by reference paragraphs 1 through 30, inclusive, as if set forth fully herein.

63.    As set forth above, Foodwit misappropriated Trustwell's confidential, proprietary, and trade secret Genesis Foods software system and related information to help build, market, and launch Workbench, a competing product, to customers across the country. In the process, as set forth above, Foodwit has made and continues to make false and misleading statements, and deceptively failed to disclose material information, about the origin, development, and purportedly unique nature of Workbench, including its software and source data, which was built

using Trustwell's stolen materials, in violation of at least sections 2532(a)(1), (2), (5), and (12) of Title 6 of the Delaware Code Annotated.

64.    On information and belief, and as set forth above, Foodwit's false and misleading representations and omissions had the tendency to confuse and deceive, and did confuse and deceive, consumers across the country (i.e., the intended audience), who would not seek to purchase or license Workbench if they knew the truth, and instead likely would do business (or continue to do business) with Trustwell.

65.    As set forth above, Foodwit's falsely-represented Workbench is marketed and sold across the country and travels in, and has a substantial effect on, interstate commerce.

66.    As a direct and proximate result of Foodwit's misconduct, Trustwell has suffered and will continue to suffer irreparable injury and substantial damage.  Trustwell is also entitled to an award of punitive damages and attorneys' fees.

### JURY TRIAL DEMAND

67.    Trustwell respectfully requests a jury trial in this action on all issue so triable.

### PRAYER FOR RELIEF

Based on the foregoing, Trustwell prays for the following relief against Foodwit:

1.    Judgment in Trustwell's favor and against Foodwit on all causes of action alleged herein;

2.    A preliminary and permanent injunction to enjoin Foodwit, its agents, representatives, employees, attorneys, successors, and assigns, and all persons and entities acting in concert with them, from further misappropriation or unauthorized use of Trustwell's confidential, proprietary, and trade secret information and materials;

3.    An order for Foodwit to pay Trustwell compensatory damages based on competent and admissible evidence at trial, which damages exceed the jurisdictional minimum of this Court, with interest at the highest rate allowable by law;

16

4.    An order for Foodwit to pay Trustwell consequential and actual damages or disgorgement of Foodwit's profits unjustly obtained, restitution, and/or reasonable royalties, based on competent and admissible evidence at trial, which damages exceed the jurisdictional minimum of this Court, with interest at the highest rate allowable by law;

5.    An order for Foodwit to pay Trustwell exemplary, treble, and/or punitive damages for Foodwit's intentional, knowing, willful, malicious, fraudulent, and oppressive conduct;

6.    An order for Foodwit to pay Trustwell its reasonable attorneys' fees and allowable costs and expenses; and

7.    All other such relief to Trustwell under law and equity as the Court deems just and proper.

Dated: September _, 2024              Respectfully submitted,


                                       By:  */s/ Kenneth L. Dorsney*

                                       Kenneth L Dorsney
                                       MORRIS JAMES LLP
                                       500 Delaware Avenue, Suite 1500
                                       Wilmington, DE  19801
                                       Telephone: (302) 888-6855
                                       Facsimile: (302) 571-1750
                                       E-mail: kdorsney@morrisjames.com

                                       Cary D. Sullivan (*PHV app. pending*)
                                       JONES DAY
                                       3161 Michelson Drive, Suite 800
                                       Irvine, CA  92612
                                       Telephone: (949) 851-3939
                                       Facsimile: (949) 553-7539
                                       E-mail: carysullivan@jonesday.com

                                       Counsel for Plaintiff
                                       TRUSTWELL

**ESHA RESEARCH**
**TERMS OF SERVICES AND END USER LICENSE AGREEMENT**

The Terms of Service and End User License Agreement (and the Exhibits hereto), together with such Order Forms (and any attachments thereto) (the "Agreement") is entered into between ESHA Research, LLC, an Oregon limited liability company, ("ESHA"), and you, the party executing this Agreement ("you" and/or "Licensee").

**RECITALS**

ESHA is in the business of developing, maintaining and marketing software applications and databases used for recipe development, nutritional analysis, regulatory information and labeling. ESHA has developed, and is the sole owner of, various software and database products used for nutritional analysis and regulatory review purposes. ("ESHA Software"). ESHA is providing you with a license to use selected ESHA Software products through a hosted application operated by ESHA and/or any third-party vendors, affiliates or contractors, Inc. ("ESHA and/or any third-party vendors, affiliates or contractors,"), which utilizes third-party software ("Third Party Software") developed by ESHA and/or any third-party vendors, affiliates or contractors, Microsoft and other third parties ("Third Party Vendors").

You have selected and purchased a license for one or more ESHA Software products bundled with applicable Third-Party Software (collectively, the "Licensed Software"). You have selected in your Order Form a scope of license for the Licensed Software specifying your access rights, who is authorized to use the Licensed Software, and for what purposes you may use the Licensed Software (the "License Scope") and are agreeing to all of the terms, conditions, warranties, and covenants contained in this Agreement regarding the Licensed Software.

**DEFINITIONS**

"Affiliate" means, with respect to a party, an entity under its direct or indirect Control or under common Control; but in any such case, such entity shall be deemed to be an Affiliate only so long as such Control exists.

"Customer" means the entity purchasing a license or right to use the Licensed Software from the parties under the terms of a legal agreement that are consistent with and no less restrictive of the entity than the terms of this Agreement, and any Affiliates of such entity authorized to use the Products.

"IPR" means intellectual property rights in and to patents, trademarks, service marks, trade and service names, copyrights, database rights and design rights (regardless of registration, and including applications for registration), know-how, moral rights, trade secrets, confidential and proprietary information, all rights or forms of protection of a similar nature or having similar or equivalent effect to any of them which may subsist anywhere in the world now existing or hereafter arising.

"Licensee Data" means the electronic data that (i) correspond to the data elements uploaded, or transmitted to the Licensed Software from Licensee or Licensee's Customers that are expressly pre approved on the applicable Order Form, (ii) are transferred to ESHA by Licensee (or by another legal entity pre-authorized in writing by Licensee to transfer data to ESHA on Licensee's behalf) during the Term for use with the Licensed Software, or (iii) with respect to a certain Customer, the

portion of 1 DocuSign Envelope ID: 16AC6A1C-B951-49D4-922A-0AA936A7AA2C Customer data transferred to ESHA by Licensee or Customer during the Term for use with the Licensed Software.

"Prohibited Data" means the following categories of Personal Data, which the parties agree are not intended to be submitted to Trustwell: national identifiers (e.g. social security numbers, social insurance numbers, date of birth, home address), government-issued identification (e.g. driver's license numbers or passport numbers), bank account numbers, credit card numbers or information relating to a customer or consumer of a financial institution under GLBA (15 U.S.C. §§ 6801–6809), places of birth, genetic data, biometric data, data revealing political opinions, religious or philosophical beliefs, protected health information as defined in HIPAA (45 C.F.R. § 160.103) or data concerning health or a natural person's sex life or sexual orientation; or any information about an individual that is under the age of 13 (or such greater age as may be prohibited by Data Protection Law).

"Term" means the term of this Agreement, commencing on the Effective Date and continuing until all Order Forms have expired or been terminated.

<b>TERMS</b>

In consideration of the above recitals and the terms, representations, warranties, covenants and conditions below, the parties agree as follows:

**1. Grant of License**. Subject to the terms and conditions below, ESHA grants to you a limited, nontransferable, nonexclusive license, for the duration of the License Term, to access and use through the Internet the Licensed Software specified in the Order Form as follows:

- In the event you have licensed an ESHA software application, including but not limited to ESHATrak®, REX®, or any other ESHA licensed product or service tool, you shall have the right to access and use through the internet, for the licensed number of users specified in the Order Form, the ESHA software application together with applicable Third-Party hosted service, for the sole purpose of the Licensee's own personal access.

**2. Scope of License**. You are licensed to allow each individual authorized user established and paid for by Licensee to access and use the applicable Licensed Software, provided that no authorized user may share his or her login credentials.

**3. Limitations on License**. Licensee may use the Licensed Software solely for its internal business use by its own employees, consultants, advisors or agents in the manner licensed in this Agreement. The Licensee is not licensed to do any of the following: (a) copy, sublicense, rent, lease, lend or otherwise transfer, disclose or publish the Licensed Software (or any portions thereof), or in any manner transfer or assign Licensee's rights under this Agreement without the prior written consent of ESHA; (b) use the Licensed Software for any purpose other than the purposes specifically licensed herein; (c) use the Licensed Software for the benefit of third parties or as part of its own commercially licensed products or services; (d) remove or obscure the ESHA copyright or trademark notices, or those of applicable Third Party Vendors, appearing on or with the Licensed Software; (e) compile the Licensed Software from one form to another or attempt to interfere with, disable, modify, convert, reverse engineer, reverse compile, change or reverse assemble it; (f) compile, extract, strip, mine, harvest or otherwise collect, directly or indirectly, the data from the nutritional database embedded within the Licensed Software; (g) post or transmit on or through the Licensed Software host server any libelous, obscene or otherwise unlawful information of any kind; (h) engage in any conduct involving the Licensed Software or its host

server(s) that would constitute a criminal offense or give rise to civil liability under any local, state, federal or other law or regulation; (i) engage in any activities that would interfere with or disrupt use of the Licensed Software or its hosting server(s) by others, including, without limitation, distributing "spam," attempting the unauthorized access to data belonging to third parties, or knowingly introducing, or permitting to be introduced, into or through the server(s) hosting the Licensed Software any worm, virus, Trojan horse or other malware or spyware; or (j) use the Licensed Software or its hosting server(s) for any use in which the failure of the Licensed Software or its hosting server(s) could lead to the death or serious bodily injury of any person, or to severe physical or environmental damage.

**4. License Fees**. Licensee shall pay ESHA license fees in the amounts, and upon the terms, set forth in the Order Form. All fees due shall be stated and paid in U.S. Dollars. The fees set forth are exclusive of all taxes, levies, or duties imposed by taxing authorities, and payment of all applicable federal, state, local, and foreign sales and use taxes, ad valorem taxes, value-added taxes, tariffs, and duties shall be the sole obligation of Licensee.

**5. Maintenance and Updates**. ESHA may automatically update the Licensed Software, including the nutritional or regulatory databases contained therein, with whatever updates it has, in its sole discretion, prepared for commercial release from time to time. You hereby agree to ESHA automatically, and without prior notice, updating the Licensed Software.

**6. Ownership, Copyrights**. ESHA is the sole owner of all rights, title, and interest in the ESHA Software, including the embedded nutritional and regulatory database(s) and all customized and derivative works based upon them, and including all copies thereof and all copyright, patent, trademark, trade secret rights and other intellectual property rights embodied therein. The Third-Party Vendors are the sole owners of their respective Third-Party Software products, including all customized and derivative works based upon them, and including all copies thereof and all copyright, patent, trademark, trade secret rights, and other intellectual property rights embodied therein. All rights not specifically granted in this Agreement are reserved by ESHA and, as applicable, by its Third-Party Vendors. No implied rights are granted. Branding and Attribution. (a) If the nutrition analysis or reports generated by the application are for public or published commercial purposes (e.g., books, brochures, or web pages summarizing the nutritional content) the Licensee will include ESHA's Copyright and Trademark notification (e.g., "Powered by the ESHA Research Nutrient Database©" in the "About" section of the web site or other similar acknowledgment section of the published material at https://esha.com/nutrition-analysis-attributions/. Licensee shall not otherwise use ESHA's name or trademarks without ESHA's prior written consent. (b) Licensee agrees, with Licensee's CEO's written consent, to allow its name and/or logo to be included in materials listing ESHA customers.

**7. Licensee's Obligations to Protect the Licensed Software**. As a continuing condition of the licenses granted herein, Licensee covenants to use the Licensed Software only for the purposes set forth in this Agreement and for no other purpose and shall use commercially reasonable efforts to protect the Licensed Software from unauthorized use, reproduction, publication, or distribution.

**8. Lawful Use**. Licensee (by and through itself and its authorized users) shall at all times use the Licensed Software in full compliance with all laws and regulations and shall not use the Licensed Software in any manner that ESHA would reasonably find inconsistent with its good business reputation.

**9. Indemnification.**

9.1. <u>By Licensee</u>. Licensee shall, at its sole cost and expense, indemnify, defend and hold harmless ESHA, its affiliates and its and their respective officers, directors, equity holders, employees, counsel, consultants and agents ("Indemnitees") from and against all losses, liabilities, costs, damages and expenses, including but not limited to reasonable legal fees and expenses finally awarded against ESHA or amounts paid by ESHA ("Losses"), incurred or suffered by any of them as a result of third party claims, actions or demands ("Claims"), arising out of or in connection with (i) Licensee's unauthorized use of the Licensed Software; or (ii) the Licensee Data; or (iii) infringement or misappropriation of IPR resulting from the unauthorized use of the Licensed Software.

9.2. <u>By ESHA</u>. ESHA shall, at its sole cost and expense, indemnify, defend and hold harmless Licensee, its affiliates and its and their respective officers, directors, equity holders, employees, counsel, consultants and agents ("Indemnitees") from and against all losses, liabilities, costs, damages and expenses, including but not limited to reasonable legal fees and expenses finally awarded against Licensee or amounts paid by Licensee ("Losses"), incurred or suffered by any of them as a result of third party claims, actions or demands ("Claims"), arising out of or in connection with infringement or misappropriation of IPR resulting from the authorized use of the Licensed Software. The foregoing shall not apply to the extent a Claim against Licensee arises from a Non-ESHA Application.

9.3. <u>Process</u>. The indemnified party shall provide the indemnifying party with prompt written notice and copies of relevant documentation regarding any claim or action for which indemnification may be sought. Failure by the indemnified party to give such notice to the indemnifying party shall not relieve the indemnifying party of its indemnification obligation under this Agreement except to the extent that such failure materially disadvantages the indemnifying party. If the indemnifying party fails to appoint an attorney within ten (10) business days after it has been notified in writing of any such claim or action, the indemnified party will have the right to select and appoint an attorney and the reasonable cost and expense thereof will be paid by the indemnifying party. The indemnifying party shall control the defense of any such claim, provided however that it shall not settle, compromise or consent to the entry of any judgment, unless such settlement, compromise or consent includes an unconditional release of the relevant indemnitees from all liability arising out of such claim or action, and is solely monetary in nature and does not include a statement as to, or an admission of culpability or failure to act by or on behalf of, the relevant indemnitees or otherwise adversely affect any of them. The indemnified party shall reasonably cooperate with the indemnifying party in the defense thereof at the indemnifying party's expense.

9.4. <u>Additional Actions by ESHA</u>. Without limiting either party's indemnification obligations, if ESHA's Licensed Software are enjoined for any reason or if ESHA believes they may be enjoined then ESHA shall have the right, at its own expense and in its sole discretion, to: (i) procure for the Licensee the right to continue using the applicable Licensed Software, (ii) to modify the Licensed Software as applicable, or any parts thereof or re-direct the manner in which they are used such that they become non-infringing, or (iii) to replace the service or any parts thereof, as applicable with non-infringing materials, or if none of the foregoing is commercially reasonable, terminate the Agreement and refund on a pro-rata basis the Fees paid by Licensee for the period such Licensed Software was not available or usable.

9.5. <u>Exclusive Remedy</u>. This Section 9 states the indemnifying party's sole liability to, and the indemnified party's exclusive remedy against, the other party for any type of claim described in this Section 9.

4

# Summary of Comments on Document

## Page: 25

Number: 1          Author: Stephen Bruce          Date: 2/1/2024 3:52:00 PM -05'00'
The indemnification for Licensee Data would include claims beyond IP infringement, for example data access claims for Personal Data.

**10. Protection of Data**

10.1. Licensee is responsible for obtaining and using its own anti-virus, anti-Trojan, anti-malware, and internet and network security software and/or devices to ensure that no third parties (e.g., hackers) take advantage of the fact that Licensee's computers are connected to the internet or are accessing the Licensed Software through the internet.

10.2. ESHA will maintain the following minimum security safeguards, as further detailed in Exhibit A (Security Controls): (a) appropriate technical, physical, administrative and organizational controls designed to maintain the confidentiality, security and integrity of Licensee's Confidential Information, including Licensee Data, (b) systems and procedures for detecting, preventing and responding to attacks, intrusions, and system failures, and regular testing and monitoring of the effectiveness of such systems and procedures, including, without limitation, through vulnerability scans and penetration testing, (c) a team of employees dedicated to implementation and maintenance of security controls, and (d) annual assessment of risks that could result in unauthorized disclosure, misuse, alteration, destruction or other compromise of Licensee's Confidential Information, including Licensee Data, and of the sufficiency of systems and procedures in place to mitigate those risks. On written request, ESHA will provide to Licensee its SOC 2 type 2 independent audit report, which shall be considered responsive to Licensee requests for ESHA security information.

**11. User Accounts and Security**. Licensee shall promptly provide ESHA with complete and accurate information required to establish a login identity and password for Licensee's authorized individual users so they may access the Licensed Software. Licensee is solely responsible for maintaining the confidentiality of the user IDs and passwords of its authorized users, and for logging out of Licensee's account at the end of each session. Neither ESHA nor its Third-Party Vendors will be responsible for any losses or damages incurred as a result of an unauthorized use of Licensee's account. Licensee shall notify ESHA immediately of any unauthorized use of Licensee's logon identities or passwords so that ESHA may take appropriate actions.

**12. Term of Agreement, Termination.**

12.1 This Agreement shall become effective upon Licensee's on-line or written order submission to ESHA. Subject to the termination provisions below, the license rights granted herein shall remain in effect on in increments specified in your Order Form.

12.2 ESHA may terminate this Agreement and the licenses granted herein immediately in the event Licensee breaches any term or condition of this Agreement and fails to cure such breach within 10 days following its receipt of written notice thereof. If the licenses granted under this Agreement expire or terminate, Licensee services will be terminated. Licensee acknowledges and agrees that in the event a license expires or terminates, ESHA may remotely disable or otherwise remove the applicable Licensed Software from Licensee's use without further notice or approval.

12.3 The Product access time period is specified and consented to at time of execution. The Order Form is non-cancelable and ESHA will not credit or refund any balance of time for early termination requests by the licensee.

**13. Confidential Information.** The Licensed ESHA Software (including the nutritional and regulatory database information embedded therein) and all other information ESHA discloses to Licensee in connection with them, shall be considered ESHA's Confidential Information, which ESHA discloses only

subject to this Agreement. Licensee agrees that it and its employees, agents and representatives shall, except as permitted herein: (i) keep ESHA's Confidential Information strictly confidential, and shall not disclose such information to any other person or entity without the express written consent of ESHA; (ii) limit internal disclosure of the Confidential Information solely to its employees, agents and representatives who must be apprised of the Confidential Information to advance the purposes of this Agreement, and only to the extent that they must be apprised for those purposes; (iii) contractually bind all such persons to honor the confidentiality and use restrictions imposed upon the Licensee; (iv) use the Confidential Information solely for the purpose of using the Licensed Software as licensed by ESHA in this Agreement; and (v) upon demand, immediately surrender to ESHA the Confidential Information and all notes, records, documentation, models, software, databases and other items or materials containing such Confidential Information. Confidential Information shall not include: (i) information that is in, or enters into, general public access without breach of this Agreement through no fault of Licensee; (ii) information Licensee was demonstrably in possession of prior to receiving it from ESHA; (iii) information Licensee can demonstrate was developed by Licensee independently of, and with neither use of nor reference to, ESHA's Confidential Information; and (iv) information Licensee receives from a third party without restriction on disclosure and without breach by such third party of a nondisclosure obligation. Notwithstanding the above, Licensee understands and acknowledges that the public availability of, or Licensee's possession of, any particular nutritional regulatory information shall not in any manner reduce the confidentiality of the regulatory database embedded within the Licensed Software as a confidential and proprietary collection of data.

**14. Representations and Warranties**. ESHA warrants that the ESHA Software application is, and will be, of original development by ESHA.

14.1. Mutual. Each party represents and warrants as to itself that: (i) it has and will continue to have the authority and all necessary rights, licenses, consents, permissions, and approvals to enter into, to grant the rights and perform the duties and obligations described in this Agreement, (ii) the performance of its obligations hereunder does not conflict with any other agreement either signed or contemplated, and (iii) the performance of its obligations hereunder shall be in compliance with all Applicable Laws.

14.2. ESHA Warranties. ESHA represents and warrants to Licensee that the Licensed Software will materially perform the functions described in the Documentation, and the functionality and security controls will not materially decrease during any paid Term. In the event of any failure of these warranties, ESHA will, at ESHA's sole option, and as Licensee's sole and exclusive remedy, either repair the applicable Licensed Software or terminate the applicable Order Form or portion thereof and refund to Licensee a pro-rata amount of Fees paid for the period during which the Licensed Software were rendered unusable. Company further represents and warrants that Company will perform the Services in a good, workmanlike and professional manner. Licensee's remedy for breach of this warranty of Services shall be the re-performance of the relevant Services free of charge.

a. Malicious Software. ESHA will use commercially reasonable efforts to maintain security safeguards (including the use of generally available and accepted anti-virus software and procedures) and will not introduce harmful code of any description (whether called viruses, worms or otherwise) including any computer code, programming instruction, or set of instructions that is intentionally constructed to damage, interfere with or otherwise adversely affect computer programs and/or data files and/or hardware and/or computer systems and/or networks.

6

Page: 27

---

Number: 1    Author: Stephen Bruce    Date: 2/1/2024 3:55:00 PM -05'00'
Added to mutual warranties below.

any breach of such covenants, ESHA shall be entitled to injunctive relief and such other and further relief, including damages, as may be provided by law.

**19. Notice of Claims**. You must notify ESHA in writing of any known claim you have against ESHA within ninety (90) days following your knowledge of such claim. Nothing herein shall limit or preclude any statutory limitations on the assertion of claims.

**20. Non-Waiver**. The failure or delay of either party to require performance of, or to otherwise enforce, any condition or other provision of this Agreement shall not waive or otherwise limit that party's right to enforce, or pursue remedies for the breach of, any such provision or condition. No waiver by either party of any particular condition or provision of this Agreement, including this non-waiver provision, shall constitute a waiver or limitation on that party's right to enforce performance of, or pursue remedies for the breach of, any other condition or provision of this Agreement.

**21. Successor Interests**. This Agreement and the rights granted hereunder are not assignable or transferable by Licensee without the express written consent of ESHA, which shall not be unreasonably denied or delayed. Subject to this restriction, this Agreement is binding upon and shall inure to the benefit of, the successors, assigns, and bankruptcy estates of each of the parties.

**22. Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the state of Delaware without regard to, or application of, any conflict of law provisions.

**23. Jurisdiction, Venue**. The parties agree that any suit, action, or arbitration proceeding arising out of or relating to this Agreement shall be brought in and the parties expressly consent to the exclusive jurisdiction of the courts of the state of Delaware.

**24. Attorney's Fees.** If either party to this Agreement breaches any term of this Agreement, then the other party shall be entitled to recover all expenses of whatever form or nature, costs, and attorney's fees reasonably incurred to enforce the terms of the Agreement, whether or not suit is filed, including such costs or fees as may be awarded in arbitration or by a court at trial or on appeal. In addition, in the event either party to this Agreement becomes a debtor subject to the United States Bankruptcy Code, the non-debtor party shall be entitled to recover any expenses, costs, and fees, including attorney's fees, incurred in connection with enforcing its rights against the debtor party, whether those rights arise under this contract or involve matters arising solely under the Bankruptcy Code.

**25. Severability**. If any court of competent jurisdiction finds any term of this Agreement or of any other document or instrument referred to or contemplated in this Agreement, to be invalid or unenforceable, such determination shall not affect the validity and enforceability of the remainder of the Agreement, and the court shall enforce the Agreement in such a manner as to give substantial effect to the intent of the parties as expressed in the Agreement.

**26. Paragraph Headings**. All paragraph headings in this Agreement appear for convenience of reference and shall not affect the meaning or interpretation of the Agreement.

**27. Amendments**. This Agreement may be amended or modified only by a written instrument executed and agreed upon by both parties, which expressly states the intent of the parties to modify or amend this Agreement.

**28. Entire Agreement**. This Agreement and the Order Form constitute the entire agreement between the parties pertaining to the subject matter of the Agreement and supersede all prior discussions, negotiations, understandings, representations, and agreements, whether oral or written. The Order Form shall, for all purposes, consist solely of the standard order documentation provided by ESHA to you. No terms or conditions including purchase order or similar documentation provided by you, nor any amendments you make to ESHA's Order Form, shall be effective. All terms of this Agreement are contractual and not mere recitals.

EXHIBIT A
Security Controls
Any capitalized term used in this Exhibit and not expressly defined herein shall have the meaning specified in the
Agreement.
1. DEFINITIONS
1.1. "Authorized User" means an individual who is authorized by Licensee to use the Licensed Software, for whom
Licensee has ordered the Licensed Software, and to whom Licensee (or ESHA at Licensee's request) have supplied a
user identification and password. Users may include, for example, Licensee's employees, consultants, contractors
and agents, and third parties with which Licensee transacts business, provided such Authorized Users do not or are
not direct competitors to ESHA. Any use by contractors, subcontractors or outsourcing vendors acting on
Licensee's behalf shall be subject to the terms of this Agreement and Licensee remains responsible for its
obligations and for the activities and omissions of such third parties. In addition, Licensee may not access the
Services for purposes of monitoring availability, performance or functionality, or for any other benchmarking or
competitive purpose.
1.2. "Configuration Services" means any configuration services provided to Licensee by ESHA, as set forth in
Appendix 1 (Configuration Services) which Appendix is subject to the terms of this Agreement.
1.3. "Non-ESHA Applications" means a Web-based or offline software application that is provided by Licensee or a
third Party and interoperates with the Licensed Software, including, for example, an application that is developed
by or for Licensee.
2. Provision of the Licensed Software
2.1. ESHA will (a) make the Licensed Software available to Licensee pursuant to this Agreement and the applicable
Order Form, (b) provide Support Services for the Licensed Software to Licensee at no additional charge, and (c) use
commercially reasonable efforts to make the Licensed Software available to Licensee in accordance with ESHA
Support Services Service Level Agreement, except for: (i) planned downtime (of which ESHA shall give at least
forty-eight (48) hours electronic notice and which ESHA shall schedule to the extent practicable during the
weekend hours between 6:00 p.m. Friday and 3:00 a.m. Monday Eastern time), and (ii) any unavailability caused by
circumstances beyond ESHA's reasonable control, including, for example, an act of God, act of government, flood,
fire, earthquake, civil unrest, act of terror, strike or other labor problem (other than one involving ESHA's

10

employees), Internet service provider failure or delay, Non-ESHA Application, or denial of service attack.

2.2. Protection of Licensee's Data. ESHA will maintain commercially reasonable administrative, physical, and

technical safeguards for protection of the security, confidentiality and integrity of Licensee's Data and to prevent

unauthorized access to or use of the Licensed Software. Those safeguards will include, but will not be limited to,

measures for preventing access, use, modification or disclosure of Licensee's Data by ESHA's personnel except (a)

to provide the Licensed Software and prevent or address service or technical problems, (b) as compelled by law in

accordance with Section 2.3 (Compelled Disclosure) below, or (c) as Licensee expressly permits in writing. ESHA will

notify Licensee immediately in the event of any known and confirmed unauthorized access to or use of Licensee's

Data. ESHA shall, at the Licensee's written request, provide an annual SOC 2 Type II Report on Controls at a Service

Organization prepared by a reputable independent third-party that attests to the compliance of certain security

controls with industry standards. If a report contains any exceptions, ESHA shall implement mitigating controls

within an appropriate period commensurate with the risk presented.

3.0. Integration of Non-ESHA Applications (Third Party Software)

3.1. Any exchange of data between the Licensee and any Non-ESHA Application is solely between Licensee and the

applicable non-ESHA provider. ESHA does not warrant or support Non-ESHA Applications or other non-ESHA

products not provided by ESHA. ESHA disclaims all responsibility and liability for Licensee's integration of Non

ESHA Applications.

3.2. Non-ESHA Applications and Licensee's Data. If Licensee installs or enables a Non-ESHA Application for use with

the Licensed Software, Licensee grants ESHA permission to allow the provider of that Non-ESHA Application to

access Licensee's Data as required for the interoperation of that Non-ESHA Application with the Licensed Software.

ESHA disclaims all responsibility and liability for any disclosure, modification or deletion of Licensee's Data

resulting from any such access by a Non-ESHA Application.

4. Security Control Processes.

4.1. ESHA will only use Licensee Data for the purposes of fulfilling its obligations under the Agreement. ESHA will

maintain and enforce physical and logical security procedures with respect to its access and maintenance of

Licensee Data contained on ESHA servers.

4.2. ESHA will use reasonable measures to secure and defend its location and equipment against "hackers" and

others who may seek to modify or access the ESHA servers or the information found therein without authorization.

ESHA will test its systems for potential security breaches at least annually.

4.3. ESHA has a written information security program ("Information Security Program") that includes administrative, technical, and physical safeguards that protect against any reasonably anticipated threats or

hazards to the confidentiality of the Licensee Data, and protect against unauthorized access, use, disclosure,

alteration, or destruction of the Licensee Data.  In particular, the ESHA's Information Security Program shall

include, but not be limited, to the following safeguards where appropriate or necessary to ensure the protection of

Confidential Information and Licensee Data:

4.3.1. Access Controls – policies, procedures, and physical and technical controls: (i) to limit physical access to

its information systems and the facility or facilities in which they are housed to properly authorized persons

and (ii) to authenticate and permit access only to authorized individuals.

4.3.2. Security Incident Procedures – policies and procedures to detect, respond to, and otherwise address

security incidents, including procedures to monitor systems and to detect actual and attempted attacks on or

intrusions into Licensee Data or information systems relating thereto, and procedures to identify and respond

to validated security incidents, mitigate harmful effects of security incidents, and document security incidents

and their outcomes.

4.3.3. Contingency Planning – policies and procedures for responding to an emergency or other occurrence

(for example, fire, vandalism, system failure, and natural disaster) that damages Licensee Data or systems that

contain Licensee Data, including a data backup plan and a disaster recovery plan.

4.3.4. Device and Media Controls – policies and procedures that govern the receipt and removal of hardware

and electronic media that contain Licensee Data into and out of a ESHA data center, and the movement of

these items within a ESHA data center, including policies and procedures to address the final disposition Licensee Data.

4.3.5. Audit controls – hardware, software, and/or procedural mechanisms that record activity in information

systems that contain or use Licensee Data.

4.3.6. Data Integrity – policies and procedures to guard against the unauthorized disclosure, improper alteration, or unauthorized destruction of Licensee Data.

4.3.7. Transmission Security – encryption of Licensee Data at rest within the Licensed Software and encryption

of electronic information while in transit to guard against unauthorized access to Licensee Data that is being

transmitted over public communications network.

4.3.8. Secure Disposal – policies and procedures regarding the disposal of Licensee Data, taking into account
available technology that can be used to sanitize storage media such that stored data cannot be practicably
read or reconstructed.

4.3.9. Testing – ESHA shall regularly test the key controls, systems and procedures of its Information Security
Program to verify that they are properly implemented and effective in addressing the threats and risks
identified. Tests will be conducted or reviewed in accordance with recognized industry standards (e.g., AICPA,
SSAE 18, and their successor audit standards, or similar industry recognized security audit standards).

4.3.10. Adjust the Program – ESHA shall monitor, evaluate, and adjust, as it deems necessary, the Information
Security Program in light of any relevant changes in technology or industry security standards, the sensitivity
of Licensee Data, and internal or external threats to ESHA or the Licensee Data.

4.3.11. Security Training – ESHA shall provide annual security awareness and data privacy training for its
employees that will have access to Licensee Data.

4.3.12. Confidentiality - ESHA shall require that all ESHA employees who are granted access to Licensee Data
undergo appropriate screening, where lawfully permitted, and enter into a confidentiality agreement prior to
being granted such access.

**15. Limitation of Warranties**. Other than the warranties expressly set forth in this Agreement, ESHA makes no other warranties, express or implied, and the Licensed Software shall be provided on an "as is" and "as available" basis. ESHA specifically disclaims, to the fullest extent allowed by law, all implied warranties, including, without limitation, the implied warranties of merchantability and fitness for a particular purpose and any warranties under the Uniform Computer Informational Transactions Act, as may be adopted by any jurisdiction from time to time.

**16. Limitation of Remedies**.

16.1. EXCEPT FOR EXCLUDED CLAIMS, IN NO EVENT, SHALL EITHER PARTY, ITS AFFLIATES OR PROVIDERS BE LIABLE HEREUNDER FOR ANY INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS, LOST TIME, LOST DATA OR LOST GOOD WILL, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE.

16.2. Except for the indemnity obligations herein and the payment obligations hereunder, and any claims based on willful misconduct, gross negligence or fraud, in no event shall the maximum cumulative liability of a party or its Affiliates arising under or related to this Agreement, regardless of the form of action, exceed, in the aggregate, the fees paid or payable by the other party during the twelve (12) months preceding the claim.

16.3. Excluded Claims. The limitations set out in Sections 16.1 and 16.2 shall not apply to claims that are not excludable as a matter of law ("Excluded Claims").

16.4. Conditions. The exclusions and limits in this Section 16 reflect the parties' allocation of risk and will apply under any legal theory (including, without limitation, contract or tort), even where a party was aware of the possibility of such damages, the damages were foreseeable, or any remedies hereunder fail of their essential purpose.

16.5. ESHA shall not be responsible under this Agreement for any Liability arising from or related to Licensee's or Customer's upload, use or provision of Prohibited Data to the Licensed Software.

**17. Independent Parties**. ESHA and Licensee agree that Licensee is an independent licensee and that the relationship created by this Agreement is not that of employer and employee, partnership, joint venture, or franchise. Licensee further acknowledges that ESHA's Third Party Vendors are independent licensors and not partners or joint ventures. No independent party shall have the authority to bind or obligate any other party in any manner.

**18. Remedies**. In the event a party breaches or defaults upon any covenant, warranty, term, or condition of this Agreement, the other party may pursue any legal or equitable remedies available to it under the laws of the state of Delaware or the applicable laws of the United States. The parties agree that in the event of a breach of any of the covenants pertaining to ESHA's intellectual property rights or Confidential Information, such a breach will result in irreparable and continuing damage in an amount which is not readily ascertainable and for which there will be no adequate remedy at law. In the event of